# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Abulla Cham, | Case No.: 0:23-cv-01156-SRN-DTS |
| Plaintiff, | |
| v. | **MEMORANDUM, DECISION AND ORDER** |
| Mayo Clinic, | |
| Defendant. | |

Michael A Fondungallah, Fondungallah & Kigham, LLC, 2499 Rice St Ste 145, St Paul, MN 55113, for Plaintiff

Claire Welch and Emily A. McNee, Littler Mendelson, P.C., 80 S. 8th Street Suite 1300, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Plaintiff Abulla Cham ("Cham"), a former security officer at Defendant Mayo Clinic ("Mayo") claims that he was denied a promotion, targeted for investigation, and eventually terminated from his position because of his race and his complaints of race discrimination in the wake of Mayo's failure to promote him.

Mayo contends that Cham's race was irrelevant to its determination not to promote him or his eventual termination. Rather, Mayo contends, Cham was terminated due to misconduct on his part related to an alleged confrontation between Cham and another individual on November 27, 2021. Mayo now moves for summary judgment [Doc. No. 33] as to all six of the causes of action—asserting both state and federal claims—that Cham brought against it in his Complaint ("Compl.") [Doc. No. 1], arguing that there are no

genuine issues of material fact in dispute and judgment should be entered in its favor as a matter of law.

Based on a review of the record, Cham's federal and state claims of race discrimination fail as a matter of law. As to his state law reprisal claim and other state law claims, the Court declines to exercise supplemental jurisdiction over them. For the reasons stated below, the Court **GRANTS** Mayo's Motion for Summary Judgment.

I.      **BACKGROUND**

A.      **Cham's Employment At Mayo Prior To November 27, 2021**

Cham, an African-American man, began working at Mayo as a full-time security officer on July 17, 2017. (Compl. at ¶ 7.) In this role, Cham was responsible for patrolling Mayo's property to maintain order, protect personnel, and prevent fire, theft, vandalism, illegal entry; enforce Mayo's policies and provide assistance to patients, visitors, and employees; and respond to complaints of wrongdoing, prepare incident reports and work in the security control centers. (*Id*. at ¶ 9.) Prior to the beginning of his employment, Cham obtained an associate's degree in law enforcement and criminal justice from Rochester Community and Technical College, and an associate's degree in supervisory management from Riverland Community College. (Fondungallah Decl. [Doc. No. 48], Ex. 1).

During the course of his employment, Cham received various performance reviews. In 2018, 2019, 2020 and 2021, Mayo rated Cham's job performance as "Achieves Expectations" in all the areas assessed. (Compl. at ¶ 10; Fondungallah Decl. Exs. 3-6.) The record did not include a performance review from 2017. Between July 2017 and November 2021, Cham received three complaints concerning his performance, and

received informal coaching in each instance from Kevin Wald, his then-supervisor. (Zwiefelhofer Decl. [Doc. No. 37] ¶ 12.)  The record does not show that Cham received any formal discipline after any of these incidents.

In October 2017, Cham received informal coaching from Wald because allegedly he did not timely respond to a complaint regarding damage to an employee's vehicle and failed to send an officer to the scene or log a complaint after a visitor made threats to a Mayo employee. (*See* McNee Decl. [Doc. No. 40], Ex. 1 ("Cham Dep.") 133:5-134:25; Zwiefelhofer Decl., Ex. B ("Wald Coaching Documentation"); McNee Decl., Ex. 18 ("Zwiefelhofer Dep.") 61:10-62:6.)

On May 22, 2019, Cham received informal coaching from Wald due to complaints that Cham was doing homework during work hours, resulting in other officers having to complete his work. (*See* Wald Coaching Documentation.) Cham allegedly responded to these complaints by attempting to deny and/or justify his conduct, but later conceded that his work had not been up to standard (*Id*.)  In deposition testimony, Cham alleged that Mayo generally allowed employees to perform homework during their shifts "because Mayo encourages people to elevate themselves educational wise[,]" and that Wald's coaching was related to Wald's allegedly poor performance in a class that he and Cham took simultaneously at American Military University. (Cham Dep. 133:13-140:1.)

On July 28, 2019, Mayo received a complaint that Cham had been condescending and rude toward Mayo employees while taking a report regarding an incident. (*See* Wald Coaching Documentation.) Cham allegedly questioned their ability to perform their jobs and made accusatory comments, which the employees in question found upsetting. (*Id*.)

3

During a meeting with Wald about the complaint, Cham denied that he had been rude, noting that he had discussed a safety concern with the staff. (*Id.*) Cham allegedly became agitated when Wald subsequently raised alleged issues with Cham's productivity while on shift, indicated that he believed that Wald had a personal problem with him, and stated that he would be thinking about transferring shifts or leaving Mayo altogether. (*Id.*) In deposition testimony, Cham acknowledged that this conversation had occurred but denied that he had been rude to other Mayo employees, and denied that he had had a conversation about his productivity with Wald in the same meeting. (Cham Dep. 141:4-145:6.)  On July 30, 2019, Cham requested a transfer to D Shift "for the best interest of Kevin Wald." (Fondungallah Decl. Ex. 25.)

During his time at Mayo, Cham obtained a bachelor's degree in criminal justice from American Military University, and completed a variety of security-related training requirements. (Fondungallah Decl., Ex. 1.) Additionally, Cham served as a member of Mayo's diversity, equity and inclusion ("DEI") committee, including assisting in developing presentations on racial bias in the workplace and teaching employee diversity training classes. (Cham Dep. 82:25-83:5; Fondungallah Decl. Ex. 6 at 5.) When asked, Cham testified that he had heard discriminatory comments directed at Black people over his years at Mayo and that he had experienced racially biased treatment from other Mayo employees, but that it had not gotten "under his skin."  (Cham Dep. 80:22-83:13.)

### B.    The Rochester Police Incident

On November 13, 2021, a separate incident (the "Rochester Police Incident") occurred in Mayo's emergency department wherein a Rochester Police Officer was alleged

to have used unnecessary force in restraining a patient who was being transported from Mayo to the Rochester jail. (*See* Zwiefelhofer Decl. ¶ 18, Ex. F (Sealed); McNee Decl., Ex. 48 ("Roberts Dep.") 46:18-19.) Mayo investigated this incident, finding that Security Officers CS, BH, HS, DS, and MA[1] were present. (Zwiefelhofer Decl. ¶ 18.) Cham was not involved in the Rochester Police Incident.

After an investigation, Mayo determined that: (1) the Rochester Police Officer involved would no longer serve as a Hospital Resource Officer at Mayo; (2) HS was issued a corrective action for failing to intervene in the incident; (3) CS, DS, and MA were issued corrective actions for failing to intervene in the incident and for failing to properly complete the required report; and (4) BH was issued a final written warning for not properly escalating the incident to leadership and for failure to complete a report. (*Id.*)

### C.     The November 27 Incident

On November 27, 2021, while on duty and patrolling outside in his Mayo uniform and marked security vehicle, Cham was involved in a confrontation with a Rochester resident hereinafter referred to as "MB." Cham's and MB's accounts of the incident varied significantly. According to Cham, he went to an approved Kwik Trip gas station to fuel his security vehicle. (Compl. at ¶ 11.) There, he encountered MB, whom he recognized; MB then allegedly began to record him with his phone. (*Id.* at ¶ 12.)  In deposition testimony, Cham described MB as "making commotions with his hands and he was holding phones

---

[1] The parties agreed to seal the disciplinary records in question. As such, the Security Officers in question are referred to by their initials.

right towards me" while his car was parked parallel and close to Cham's vehicle. (Cham Dep. 40:13-46:22.) Cham alleged that he did not have further interaction with MB at this time, and called Todd Roberts—his then-supervisor—to inform him of the incident, but was unable to reach him before Roberts called Cham in to discuss the incident. (*Id.*)

In his report on the incident, Roberts stated that at approximately 4:00 p.m. on November 27, 2021, MB called Mayo's global security operations center ("GSOC") and claimed to an operator that Cham had come to his apartment in a Mayo security vehicle and was harassing him. (Zwiefelhofer Decl., Ex. C at 1.) After Roberts left MB a message to return his call, MB called again and repeated that Cham had harassed and threatened him at his home. (*Id.*) MB claimed he was "friends with Cham's wife, and they are getting divorced, so Cham doesn't like him." (*Id.*) MB also stated that he had contemporaneous video of Cham on his phone. (*Id.*)  Roberts instructed MB to call the police if he felt threatened, but MB stated that he did not want the police involved, but rather "just wanted Cham's supervisor to be aware of what he was doing on company time[.]" (*Id.*)

Cham, Roberts, and Assistant Supervisor Ron Henry met at approximately 4:30 p.m. to discuss the situation. At that meeting, Cham:

(1) Stated that he knew MB because he "deals drugs in Cham's neighborhood and the neighborhood have called the police on MB a few times", and that "MB doesn't like him because of some interactions they have had in the neighborhood because of MB's drug dealing";

(2) Admitted that he ran into MB that day, but stated that it was at the Kwik Trip when Cham was going to get gas. Cham stated he pulled in to get gas and recognized MB at the gas station. MB then yelled something at Cham and began using his phone to video-tape him, but Cham stated that never spoke to MB, decided to not fuel up because MB was there, and left the area;

(3) Discussed the link between MB and his wife, saying that he and his wife were having problems (including mental health issues on his wife's part) and that they might get divorced, and "that his wife may have friends that know MB but as far as he knows his wife doesn't know MB"; and

(4) Denied that MB had video evidence of him at MB's apartment and that this was a lie, with MB lying to get him in trouble.

(Zwiefelhofer Decl., Ex. C at 1-2.)

Roberts subsequently decided to move Cham out of his vehicle and onto "inside duty" for a few days, to see whether MB would report Cham again while Roberts knew Cham was not patrolling outside, thus confirming MB as an unreliable witness. (*Id*. at 2.) Roberts noted that he was unsure whether MB or Cham was telling the truth, and that while Cham's personal issues may cause him to make poor decisions, he believed that MB also had a criminal history in Rochester. (*Id*. at 2.) Roberts stated that "[m]anagement will continue to monitor this going forward." (*Id*. at 2.)

### D.    Replacement of Roberts And Henry On The D Shift

Following its investigation into the Rochester Police Incident, Mayo removed Todd Roberts and Ron Henry from their D Shift supervisory positions and reassigned them to other departments. (McNee Decl., Ex. 46 ("Henry Dep.") 10:11-22.) On November 28, 2021, Roberts retired, and Henry resigned, both without prior notice. (Roberts Dep. 46:2-15; 48:8-17; Henry Dep. 9:24-10:25.) As a result, Roberts and Henry did not complete the investigation into Cham. (Roberts Dep. 29:19-24; 44:8-12; 51:16-21; 54:9-55:13.)

In early December 2021, Melissa Zwiefelhofer was appointed to the position of Senior Security Manager for Global Security. (Zwiefelhofer Decl. ¶ 2.) Due to "unplanned departures" including of Roberts and Henry, Zwiefelhofer "appointed multiple interim

positions throughout the Security Department to manage the department[,] includ[ing] an Interim Supervisor and Interim Assistant Supervisor position for the D Shift[.]" (*Id.* ¶ 4.) On December 2, 2021, Zwiefelhofer appointed Michael Lee, the C Shift's Assistant Supervisor, to be Interim Supervisor for the D Shift. (*Id.* ¶ 5.) While Lee did not have a college degree, he had been a Security Officer at Mayo since 1990 and an Assistant Supervisor since 2000. (Lee Decl. [Doc. No. 35], Ex. A.)

Zwiefelhofer testifies that, on December 13, 2021, Zwiefelhofer appointed Chelsey Scheevel as Interim Assistant Supervisor for the D Shift in consultation with Lee (Zwiefelhofer Decl. ¶ 4.)[2] Scheevel had worked as a Security Officer at Mayo since March 2020, and previously worked as a Correctional Deputy in the Dakota County Sheriff's office for approximately seven months. Scheevel had obtained a bachelor's degree in political science and an associate's degree in law enforcement and criminal justice prior to starting work at the Dakota County Sheriff's office. (Lee Decl. Ex. B.) Lee declares that, at the time he was considering whom to recommend for appointment to an Interim Assistant Supervisor position, he had "recently learned that Abulla Cham had been removed from outside patrol duties due to an incident that occurred with a Rochester resident." (Lee Decl. ¶ 5.) He "did not recommend Mr. Cham for appointment to an Interim Assistant Supervisor position based on [his] experience working with Mr. Cham and [his] knowledge of the ongoing investigation into the incident involving Mr. Cham." (*Id.*)

---

[2] Scheevel's appointment was noticed to Mayo's payroll staff on December 9, 2021, suggesting the appointment was made earlier. (Zwiefelhofer Decl. Ex. 27.) Moreover, her appointment was discussed at the December 10, 2021 B Shift meeting discussed *infra*.

### E.      Cham's Alleged Complaint Of Discrimination

Sometime after Lee was appointed, Cham alleges that he had a conversation with Lee concerning his appointment. Cham alleges that he discussed his role as a member of Mayo's DEI committee and raised concerns that Lee had been appointed from outside the D Shift when there were other qualified individuals on the shift, including Cham himself. (Cham Dep. 65:1-71:13.) Lee allegedly responded by becoming angry with Cham, stating that he had nothing to do with his new appointment but rather that Zwiefelhofer was responsible, and Cham should speak with her. (*Id*.) He then refused to discuss Cham's concerns any further. (*Id*.) Cham also alleges that Lee told him that he was "lucky to have a job," which Cham believed was evidence of racial bias (*Id*. 84:3-22.) Cham alleges that he spoke with Lee alone in his office for approximately 10 to 15 minutes, and recalled that the conversation took place on or around December 10, 2021. (*Id*. 68:11-69:13.)

On December 10, 2021, Cham alleges that Zwiefelhofer held a meeting with the staff of D Shift to discuss the appointment of Lee and Scheevel and explain the changes she planned to make. (Cham Dep. 71:5-20; McNee Decl. Ex. 7.)  Zwiefelhofer allegedly stated that she wanted to make a lot of changes. (Cham Dep. 71:17-20.) After this group meeting, Cham alleges that he spoke with Zwiefelhofer separately to discuss Lee and Scheevel's qualifications and raise concerns that he, a qualified candidate, was passed over. (*Id*. 71:21-72:7.) Cham alleges that Zwiefelhofer became frustrated and told him that Lee was the person who would be filling the position. (*Id*. 72:8-73:19.)  He further alleges that Zwiefelhofer became increasingly frustrated when he explicitly raised the fact that all the security team's supervisors and assistant supervisors were white, and that as a qualified

person of color, his appointment would promote diversity. (*Id*. 73:20-74:22.) Zwiefelhofer allegedly stated, "Abulla, as I told you, I will make a lot of changes, and you just have to follow them; Michael Lee is one employee[] who I trust to help me make the changes [that] I want in the department." (McNee Decl. Ex. 7.)

In her own deposition testimony, Zwiefelhofer confirmed that she met with the D Shift on December 10, but denied that the conversation with Cham occurred. (Zwiefelhofer Dep. 52:13-54:16.)

**F.    Subsequent Mayo Investigation Of The November 27 Incident Leading To Cham's Termination**

At some point after Lee became Interim Supervisor for the D Shift, Lee learned that "Cham had been removed from outside patrol duties due to an incident that occurred with a Rochester resident." (Lee Decl. ¶ 5.) Lee declares that "[w]hen [he] learned of the incident involving Mr. Cham, [he] contacted Ms. Zwiefelhofer to determine how to proceed and to investigate further[,]" at which point Zwiefelhofer took over the investigation. (*Id*.) Lee represented that he learned about the November 27 Incident on the "morning of December 11," at which time he told Zwiefelhofer, and Zwiefelhofer told Steven Dettman, Mayo's then-Director of Campus Security Operations. (Fondungallah Decl., Ex. 30.)

Once Zwiefelhofer learned of the November 27 Incident and Roberts' previous investigation, she restarted the investigation and arranged a meeting with Cham along with Monica Fleegel, a Senior Manager in Mayo's Human Resources department. (McNee Decl., Ex. 30; Zwiefelhofer Decl. ¶ 10 (stating "I learned of the resident's complaint the

week of December 6, 2021. The same day that I learned of the complaint, I met with Mr.

Cham[.]").)

Zwiefelhofer described her interview with Cham as follows:

Mr. Cham told me that while on duty he went to a gas station to fill up his patrol vehicle and was followed into the gas station by another man. He said that the man has bothered his wife and family before, and he has told him in the past not to bother them. Mr. Cham said that he couldn't recall the date of the event but thought that it was before he went to Colorado Springs for PTO. Mr. Cham relayed that as he pulled into the gas station, the man pulled in next to him. Mr. Cham said that he didn't get out of his vehicle and didn't roll down his window. He could see the man's mouth moving and stated that the man was "fiddling with his phone," but he didn't know what he was doing. I asked what gas station this occurred at. Mr. Cham told he wasn't certain, he thought perhaps 14th St., but was quite vague about the location.

I asked if Mr. Cham knew the person, as he would only refer to him as "the man." Mr. Cham told me that his wife knew the man. I asked if there had been previous issues between them similar to this. Mr. Cham told me that the man continues to contact his family, and that he has told him to stop. I asked Mr. Cham if he could tell me what specifically was said. Mr. Cham told me that he didn't say or hear anything, asking how any communication could have occurred if he didn't roll down his window. He then confirmed for me that he didn't roll down his window or get out of the vehicle. I asked Mr. Cham if there was a police report regarding the incident. Mr. Cham asked why the police would contact me if there was no threat or communication, again indicating that his window was rolled up. I asked if Mr. Cham contacted law enforcement. He said that he didn't, stating that he wouldn't have a need to involve law enforcement, since he wasn't threatened. He again indicated that he could see the man's mouth moving, but that the window was up. He said that he wasn't threatened.

I asked Mr. Cham how the man knew it was him in the Mayo Clinic vehicle. Mr. Cham simply replied that the man recognized him. I explained to Mr. Cham that this was an odd coincidence. Mr. Cham said that he didn't understand why it was odd. [I] relayed that for the person to identify him in a Mayo Clinic vehicle and uniform, and while driving by a gas station seemed to be an odd coincidence. Mr. Cham said that he didn't think it was odd, the man knew where he worked.

> Mr. Cham told me that he had already discussed this incident with Todd Roberts and wasn't sure why Monica and I were discussing it with him. I explained that we needed to be sure that there was no threat made, and that Mr. Cham wasn't in danger. Mr. Cham's demeanor changed when I suggested that he may be in danger. He assured me that he couldn't be in danger because he wasn't threatened. He added that he couldn't be threatened if he never rolled down his window.
>
> HR advisor Fleegel asked about the video. Mr. Cham said that he could only confirm that the man was "fiddling with his phone," he wasn't aware of any video.

(McNee Decl., Ex. 30) (cleaned up, paragraph spacing added for readability). After the meeting, Cham was placed on administrative leave. (Zwiefelhofer Decl. ¶ 11; Fondungallah Decl., Ex. 30.)

Following the meeting, Zwiefelhofer investigated the November 27 Incident further. (Zwiefelhofer Decl. ¶ 11.) She and Fleegel obtained coaching documentation from Cham's former supervisor Wald, Roberts' notes concerning the incident, and spoke with Supervisor Ernie Holeyfield, GSOC Supervisor Alex Jorissen, and Olivia McCormack, as well as Wald and Cham. (*Id*. ¶¶ 12-14.) At the outset of the investigation, Steven Dettman proposed obtaining a copy of a security video from the Kwik Trip gas station. (Fondungallah Decl., Ex. 30) On December 14, 2021, Fleegel proposed, as part of the investigation, interviewing "'the guy' who supposedly followed [Cham] to the gas station," *i.e.*, MB, if "we can't get any details from Todd." The record does not include evidence that either of these steps were taken, and Zwiefelhofer denied having performed either step. (*See, e.g.*, Zwiefelhofer Dep. 116:18-117:9.)

On December 15, 2021, Zwiefelhofer and Fleegel met with Ernie Holeyfield regarding this issue. (Zwiefelhofer Decl., Ex. D ("OSS Report").) Holeyfield told them

that Roberts had told him about the incident and believed that he had documented it somewhere but was unsure where. (*Id.*) He also stated that he believed Roberts was using caution with this incident, as it seemed that MB might have been trying to get Cham in trouble. (*Id.*) In a follow-up email, Holeyfield clarified that he would have followed up further, except that he and Roberts were removed from their leadership roles on "December 30th."[3] (*Id.*) Fleegel then spoke with Roberts by phone. Roberts directed her to the document he had written regarding this incident, and noted that he did not report this incident to HR, and was instead monitoring it to see if he received other complaints because he felt that MB may be trying to get Cham in trouble. (*Id.*)

Also on December 15, Zwiefelhofer and Fleegel spoke with Wald. (*Id.*) Wald told them that he was aware of the situation because Assistant Supervisor Lucas Hust was made aware by Jorissen. (*Id.*) Wald stated that "he was told that Mr. Cham had made threats to kill someone while he was working outside patrol." (*Id.*) He said that after the threats happened, Todd Roberts removed Cham from outside patrol, and that there might be video evidence of the event. (*Id.*) Wald also said that he had been trying to track down who might have the video evidence, and offered to continue to ask around. (*Id.*) Fleegel instructed him to cease doing so. (*Id.*) Wald told Zwiefelhofer and Fleegel that he believed "this wasn't the first time that Mr. Cham behaved this way," and relayed accounts of occasions where: (1) Cham had harassed a nurse, made her feel uncomfortable, and threatened to confront

---

[3] Based on the context of the document, "December 30" is likely a typographic error, and should read November 30.

the nurse after being told that the behavior would not be tolerated; and (2) where Cham had been reckless with a security vehicle, was involved in accidents, which eventually led Wald to prevent Cham from going on outside patrol. (*Id*.) Wald alleged that Cham had complained about him and eventually moved to Roberts' shift to get away from Wald. (*Id*.)

On December 20, 2021, Zwiefelhofer and Fleegel spoke with Jorissen. (*Id*.) Jorissen did not recall how she became aware of the November 27 Incident, but stated that she thought that Tim Healey had taken the call and transferred it to Roberts. (*Id*.) Jorissen also told Zwiefelhofer and Fleegel that she believed that McCormack had witnessed Cham looking up information on how to destroy a car on or around the date the complaint was received. (*Id*.)

On December 22, 2021, Zwiefelhofer reviewed recordings of the call made by MB to Mayo. (*Id*.) Zwiefelhofer described the call as follows:

> In the recording a man who identifies himself as MB starts the call by yelling "stop following me Cham, stop following me". He then supplied license plate number EHN 237, to identify the company vehicle that Mr. Cham was operating at the time of the call. Mr. MB said that Mr. Cham is "chasing me in you guys' company vehicle." Mr. MB said that Mr. Cham pulled into his apartment complex. Mr. MB said that he and Mr. Cham's wife are friends. He said that as a result, Mr. Cham has been harassing and stalking him. He also said that Mr. Cham has called him from a company phone[4] and threatened to kill him. Mr. MB said that he has the car on recording, but then said that it wasn't saved, but instead said that he sent the recording to Mr. Cham's wife by Snap Chat.

---

[4] According to her deposition testimony, Zwiefelhofer was unable to determine whether Cham ever called MB on a Mayo phone, and Mayo's phone log showed no outgoing calls to MB. (Zwiefelhofer Dep. 83:14-23; 163:8-164:3; 177:3-13; McNee Decl. Ex. 36.)

(*Id.*) (cleaned up)

On December 29, 2021, Zwiefelhofer and Fleegel spoke with McCormack, who informed them that she had seen Cham on a computer reading an article titled "how to destroy a car quietly" or something similar on or around the date of the November 27 Incident. (Zwiefelhofer Decl. ¶ 15; OSS Report.)

On January 4, 2022, Zwiefelhofer and Fleegel met with Cham again to ask follow-up questions about the November 27 Incident. (OSS Report.) Cham answered questions about several topics:

1) *Relationship with Cham Prior to the November 27 Incident:* Cham stated that he knew MB from when he played football, but that they don't have a relationship. Cham stated that his wife "hangs" with MB, then corrected himself to say that she helped him find shelter because he was homeless. He stated that her friends hang out with MB, but because MB does drugs, Cham didn't want his wife or kids around MB. He described that his wife began spending time with MB beginning in June or July. Cham stated that he did not know MB's address but had his phone number and had texted him to stay away from his wife. Cham stated that he lived in the northwest part of Rochester, while MB lived in the southwest part of Rochester. Cham stated that he had been at MB's home one time, at approximately 5:00 a.m. on his day off work to "investigate [his] loved one." Cham denied communicating with MB from a Mayo phone or communicating with him through social media. Cham also stated that he believed MB was attempting to "get rid" of him by getting him in trouble at work in order to be with Cham's wife. Cham provided that he had never argued with or felt threatened by MB before. During this interview, Cham became upset due to feeling that Zwiefelhofer was intruding into his personal life. (*Id.*)

2) *MB's Awareness of Cham's Place of Employment:* Cham expressed that he did not believe that MB had seen him in his Mayo uniform, and that Cham does not generally wear his uniform outside of work, but that it was common sense that MB would know what he looked like because he spends time with Cham's wife. When asked if MB had ever encountered Cham in his Security vehicle, Mr. Cham answered by stating, "I don't have control over Mr. MB." When asked how MB could recognize him

15

driving a vehicle he had never seen Cham driving before, Cham reiterated that he does not control MB and that he didn't know whether MB had followed him before. (*Id.*)

3)  *The November 27 Incident:* Cham described the location of the Kwik Trip gas station, and described the road used to approach the gas station as a 2-lane road. Cham said that he had "left Lot 38 and decided to fuel up the vehicle" at the Kwik Trip, and had chosen that gas station as it was approved by Mayo and was on his route. Cham described the nature of the encounter with MB similarly to his previous explanations. Cham could not describe where MB came from, and could not describe where he was parked in the lot or how the vehicles were positioned. He confirmed that he didn't get out of the vehicle to fuel up because "when someone is creating a situation, you get yourself away from it[,]" per his training as a security officer. Cham said that after the encounter at Kwik Trip, he described going to two or three other specific locations. He said that he had not reported the event, but that Roberts and Henry had called him and discussed it. (*Id.*)

4)  *Cham's Internet Search*: Cham initially did not admit that he had searched the internet for "liquid that can destroy a car engine," but that "[p]eople use the computers all the time. I didn't search how to kill someone." (*Id.*) Cham avoided the question of whether it was a work-related search until Fleegel asked him directly, to which Cham answered that it was not. (*Id.*)

Zwiefelhofer summarized the results of the investigation at that point in the report, and added her own views, describing Cham's description of the November 27 Incident as "vague" and implicitly inconsistent between tellings. (*Id.*) Zwiefelhofer stated that "Mr. Cham's sequence of events for the confrontation do not support his version of the confrontation" and listed ways she believed that his story was inconsistent. (*Id.*) As a result, Zwiefelhofer recommended termination of Cham's employment. (*Id.*)

On January 10, 2022, Cham was terminated by Mayo, allegedly for violating Mayo's Sexual and Other Harassment Policy, Violence in the Workplace Policy, Mutual Respect Policy, Computer Internet & Electronic Communications policies, Code of

16

Conduct, and policies addressing appropriate use of Mayo resources and time. (Compl. ¶ 31; Zwiefelhofer Decl. ¶ 17; Fondungallah Decl., Ex. 39.) Cham alleges that Zwiefelhofer "forged [his] signature on a termination document." (Compl.  ¶ 32.)

### G.    Procedural History

On or about September 1, 2022, Cham filed a timely administrative charge against Mayo with the EEOC and the Minnesota Department of Human Rights claiming discrimination based upon his race in violation of Title VII of the Civil Rights Act, and retaliation. (Compl. ¶ 5; Cham Dep. 114:13-115:5.)  On or about January 25, 2023, Cham was issued a notice of right to sue on his claims from the EEOC. (Compl. ¶ 6.)

On April 24, 2023, Cham filed suit in this district. His suit alleged (1) race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*; (2) race discrimination in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et. seq.*; (3) reprisal discrimination in violation of the MHRA, Minn. Stat. § 363A.03, subd. 16.; (4) violation of 42 U.S.C. § 1981 ("Section 1981); (5) whistleblower retaliation under the Minnesota Whistleblower Act ("MWA"), Minn. Stat. § 181.932; and (6) common-law fraud and misrepresentation. (Compl. ¶¶ 34-67.)

On May 16, 2024, following discovery, Mayo moved for summary judgment as to all of Cham's claims [Doc. No. 33].

## II.    DISCUSSION

A court may grant a party summary judgment if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  A party opposing summary judgment "'must set forth specific facts showing

that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  However, in considering a summary judgment motion, the Court must "view[] the evidence in the light most favorable to the nonmoving party," *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697 (8th Cir. 2012), and must not "weigh the evidence and determine the truth of the matter itself," *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012).  "In essence," the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

In its motion for summary judgment, Mayo makes the following arguments: (1) Cham's federal and state race-discrimination claims (Counts 1, 2, and 4) fail, as Cham has not demonstrated that Mayo's legitimate, non-discriminatory reasons for (a) failing to promote him to the Interim Supervisor or Interim Assistant Supervisor positions, and (b) terminating his employment, were pretextual; (2) Cham's MHRA reprisal claim (Count 3) fails, as Cham cannot show a causal connection between his complaint and the termination of his employment; (3) Cham's MWA claim (Count 5) fails, as it is preempted by the MHRA's exclusive-remedy provision; and (4) Cham's fraud and misrepresentation claim (Count 6) is meritless, as the alleged "fraud" is Cham's name typed onto the form rather than a signature.

A.      **Racial Discrimination Claims**

Title VII and the MHRA make it unlawful for covered employers to discriminate against any individual with respect to the terms and conditions of their employment because of such individual's race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.15(1). An employee may prove unlawful racial discrimination in two ways. First, they can provide direct evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action[.]" *EEOC v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1086 (8th Cir. 2014) (cleaned up).

Alternately, the employee can "creat[e] an inference of unlawful discrimination through the McDonnell-Douglas analysis." *Burton v. Martin*, 737 F.3d 1219, 1229 (8th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). To do this, the employee "must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Id*.

Once the employee makes this "prima facie" case, the employer may rebut the employee's evidence by providing "a non-discriminatory, legitimate justification for [their] conduct." *Id*. "Once the [employer] provides this reason, the presumption of discrimination disappears, requiring [the employee] to prove that the proffered justification [was] merely a pretext for discrimination." *Id*. (cleaned up). "The burden to articulate a

nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). Employers are entitled to make subjective personnel decisions "for any reason that is not discriminatory[,]" *Blake v. J.C. Penney Company, Inc.*, 894 F.2d 274, 281 (8th Cir.1990), and courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Canning v. Creighton University*, 995 F.3d 603 (8th Cir. 2021) (citing *Wilking v. City of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)).

To prove pretext, a plaintiff must (1) demonstrate that the defendant's stated reasons for adverse action are "unworthy of credence"; or (2) "persuad[e] the court that a prohibited reason more likely motivated" the adverse action than the proffered reason. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). The plaintiff's evidence "must do more than merely raise doubts about the wisdom and fairness of the opinions of him held by his superiors. It must create a real issue as to the genuineness of those perceptions." *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-686 (8th Cir. 2002). Pretext must be proven by a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Unlike Title VII and the MHRA, Section 1981 does not use the *McDonnell-Douglas* burden-shifting framework. Rather, a plaintiff who sues for racial discrimination under Section 1981 must plead facts plausibly showing that the discrimination was a "but-for" cause of their injury. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589

U.S. 327, 333-36 (2020). Thus, it is insufficient to show that race was merely a potential reason or motivating factor for the adverse action in question. *Id.*

Mayo argues that Cham's racial discrimination claims lack merit, because he cannot prove that Mayo's legitimate nondiscriminatory reasons were pretext for race discrimination under Title VII or the MHRA, nor can he prove that his race was the sole factor in Mayo's employment decisions under 42 U.S.C. § 1981. (Def's Br. [Doc. No. 34] at 18-27.) Mayo argues that it had legitimate, non-discriminatory reasons for not appointing Cham to the interim positions and to terminate his employment, and that in the absence of any showing of pretext, Cham's claims fail. (*Id.*; Def's Reply Br. [Doc. No. 52] at 5-11.) Mayo also argues that Cham's failure-to-promote claim relating to the Interim Supervisor position is waived. (Def's Reply Br. at 4-5.)

Cham argues that Mayo's reasons for failing to appoint him to the interim positions and for terminating him were pretext for race discrimination, as he was more qualified than Scheevel, and Mayo's investigation of the November 27 Incident was biased and its disciplinary actions disproportionate compared to similarly situated white employees. (Pl's Br. [Doc. No. 47] at 22-29.)

### 1.    Failure to Promote

Asserting that a more qualified employee was hired for a position is sufficient for an employer to establish a legitimate non-discriminatory reason for its failure to promote the plaintiff. *Carter v. Atrium Hosp.*, 997 F.3d 803, 810 (8th Cir. 2021). Where employees are similarly qualified and one is promoted over the other, there is also no clear inference

of discrimination. *See Nelson v. USAble Mut. Ins. Co.*, 918 F.3d 990, 993-94 (8th Cir. 2019) (quoting *Wingate v. Gage City Sch. Dist.*, 528 F.3d 1074, 1079 (8th Cir. 2008)).

Cham's argument that Mayo's failure to promote him to one of two interim positions is unavailing. Concerning the Interim Supervisor position, Lee had substantially greater experience as a Mayo Security Officer and, importantly, as an Assistant Supervisor, while Cham had no prior supervisory experience. Mayo has articulated a legitimate reason to promote Lee over Cham for the position of Interim Supervisor.

Concerning the Interim Assistant Supervisor position, Cham and Scheevel's qualifications are more evenly matched. Scheevel had prior law enforcement experience and a longer-standing relationship with her new supervisor, while Cham was a longer-term employee and had certain educational training in supervision and management. Under Eighth Circuit law, employers are allowed to choose between similarly qualified employees without creating an inference of racial discrimination. The facts are similar to those of *Nelson*, where the plaintiff had more years of retail experience but the defendant employer viewed her comparator's full customer service experience as more relevant to the position's requirements. *See Nelson*, 918 F.3d at 994. As such, Mayo has articulated a legitimate reason to promote Scheevel over Cham for the position of Interim Assistant Supervisor.

Cham does not point to any evidence in the record on the basis of which a reasonable jury could conclude that Mayo's reasons for promoting Lee and Scheevel rather than Cham were pretextual. Cham argues first that he had more specialized training than Scheevel. (Pl's Br. at 23.) Second, he argues that "working with Michael Lee as a requirement to be

22

promoted to a supervisory position shows Mayo's discriminatory intent—one can only be appointed if they are close to the decision maker and not because of their experience and qualifications." (*Id.*) However, favoritism towards individuals with whom the hiring manager has a prior working relationship is not prohibited by Title VII, and is not itself grounds to deny summary judgment. *Dailey v. Blue Cross Blue Shield*, 2:14-cv-1807-AKK2017, WL 2001616 at *7 (N.D. Ala. May 17, 2017) (citing *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("[W]hile it may prove unfair to hire someone because of a prior relationship, personality, or gut feeling, 'unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII [or section 1981].'"); *Ware v. Chertoff*, CIVIL NO. 04-00671 HG-LEK, 2007 WL 9711165 at *6 (D. Haw. Aug. 1, 2007) (granting summary judgment and holding that "[w]hile [defendant] may have shown favoritism to certain employees because of his prior relationships with them, Title VII only prohibits employment discrimination based on a protected class.")

Similarly, Cham cannot point to any evidence in the record that but for his race, he would have been promoted, and thus cannot make out a claim under Section 1981.

As such, Cham has not met his burden to show that there is a genuine issue of material fact in dispute as to whether Mayo's reasons for failing to promote him were pretextual. Accordingly, Mayo's motion for summary judgment as to Counts 1, 2, and 4 is granted on the failure-to-promote claim.

### 2.    Termination

A plaintiff can show that a termination was pretextual by demonstrating that the employer "treated similarly-situated employees in a disparate manner[,]" *Lake v. Yellow Transp. Inc.*, 596 F.3d 871, 874 (8th Cir. 2010), or that it "deviated from its policies." *Stallings*, 447 F.3d at 1052. However, to do so, the plaintiff "has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to [the plaintiff] by a preponderance of the evidence." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000) (citing *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir.1994).) "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id*. Moreover, when considering an employer's allegedly pretextual termination of an employee, the "critical inquiry" is not whether the employee truly engaged in the conduct at issue, "but whether the employer in good faith believed that the employee was guilty of the conduct." *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 862 (8th Cir. 2009).

As an initial matter, Mayo argues—and Cham does not dispute—that Mayo has asserted a facially legitimate justification for its termination of Cham, through its investigation of the November 27 Incident and its determination that Cham had harassed a member of the public and violated Mayo policies. As such, Cham must prove that Mayo's asserted justification was pretextual.

Cham's argument that a reasonable jury could find that his termination was pretext for race discrimination is unavailing. As an initial matter, Cham raises no direct evidence

of racial animus in this decision. Concerning Mayo's alleged deviation from policy, while Cham argues that Mayo deviated from its investigative policy in investigating his claim, he does not provide any evidence that Mayo has a firm investigative policy from which it deviated. Zwiefelhofer testified in her deposition that to her knowledge, there is no Mayo investigations policy, nor any processes, procedures, or manual. (Zwiefelhofer Dep. 18:10-21.) There is no other evidence concerning an investigations policy in the record. Mayo cannot deviate from a nonexistent investigations policy such that doing so presents a disputed issue of material fact for a jury.

Concerning his allegedly disparate treatment, the comparators raised by Cham are not sufficiently comparable to draw an inference of discrimination. The comparator that Cham focuses on in his briefing, Security Officer CS, was disciplined but not terminated for his involvement in the Rochester Police Incident.[5] While Cham and CS shared the same supervisors and job title, the conduct for which CS was disciplined was substantially different from Cham's alleged misconduct. CS was disciplined for failing to intervene in the actions of a Rochester police officer during his arrest of a patient, while Cham was accused of directly harassing a member of the public. These are not comparable circumstances, and Mayo may reasonably judge that Cham's actions require a different response. In the absence of any other evidence of racial discrimination as a motivating factor, Cham cannot meet his burden to show pretext by a preponderance of the evidence.

---

[5] The remaining comparator Security Officers were either also disciplined in connection with the Rochester Police Incident, or were not actually disciplined. Cham's briefing only discusses Officer CS.

Similarly, Cham can produce no evidence to prove that but for his race, he would not have been terminated, and thus cannot make out a claim under Section 1981.

As such, Cham has not met his burden to show that there is a disputed issue of material fact over whether Mayo's reasons for terminating him were pretextual. Mayo's motion for summary judgment as to Counts 1, 2, and 4 is granted on the termination claim.

### B.    Remaining State Law Claims

Pursuant to 28 U.S.C. § 1367(c), this Court may decline to exercise supplemental jurisdiction over a claim if, for among other reasons, "the district court has dismissed all claims over which it has original jurisdiction." With the dismissal of Counts 1, 2 and 4, only state law claims remain. As a result, this Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). *See D.J.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 767 (8th Cir. 2011); *see also Doucette v. Morrison County*, Civil No. 12–cv–00373 ADM/LIB, 2013 WL 2359660 at *15 (D. Minn. May 29, 2013) (declining supplemental jurisdiction over state-law reprisal claim after granting summary judgment to the defendant on federal claims).

III.    **ORDER**

Based on the submissions and the entire file and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1) Defendants' Motion for Summary Judgment [Doc. No. 33] is **GRANTED** as to Counts 1, 2, and 4 of the Complaint [Doc. No. 1].

2) Counts 3, 5 and 6 of the Complaint are **DISMISSED WITHOUT PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY**


Dated: August 9, 2024                          /s/ *Susan Richard Nelson*
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge